UNION TANK LINE CO. v. AMERICAN CAR & FOUNDRY CO.

(District Court, S. D. New York. January 28, 1913.)

1. PATENTS (§ 234*)—"INFRINGEMENT"—USE OF PARTS OF DEVICE.
   To constitute "infringement," it is unnecessary to use the entire device; but if parts thereof are used in substantially the same way, and in a similar contrivance, it is infringement.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 370, 381; Dec. Dig. § 234.*
   For other definitions, see Words and Phrases, vol. 4, pp. 3590-3594.]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—TANK CAR.
   The Van Dyke patent, No. 768,888, for a railroad tank car, in which the tank is secured to the underframe in the middle only, to allow for free expansion longitudinally, was not anticipated and discloses invention; also held infringed.

In Equity. Suit by the Union Tank Line Company against the American Car & Foundry Company. On final hearing. Decree for complainant.

Gifford & Bull, of New York City (Livingston Gifford and George E. Cruse, both of New York City, of counsel), for complainant.

Frederick P. Fish, Frederick H. Gibbs, and Charles J. Hardy, all of New York City, for defendant.

HAZEL, District Judge. The bill alleges infringement of claims 14 to 17, inclusive, of letters patent No. 768,888, granted August 30, 1904, to John W. Van Dyke, for improvements in railroad cars. The invention more particularly relates to tank cars of sheet metal construction for carrying oil or other liquids, having the tank riveted at the center to the underframe, which serves to receive and transmit the stresses and shocks incident to the movements of the car. Such tank cars, according to the evidence, were designated as "center anchor" cars at a meeting of the Master Car Builders' Association where they were under discussion, and such designation will for brevity be adopted herein.

In recognition of the prior state of the art, the inventor in his specification says:

"Heretofore two general sorts of tank-attaching means have been devised—one in which the tank seated on the underframe between longitudinally and laterally retaining devices is prevented by straps from being thrown from its seat, and the other in which the tank is secured by rivets or the like. In accordance with the present invention the middle of the tank is secured to the underframe by rivets, and the ends are held down between laterally retaining devices by means which allow the tank to expand longitudinally. Devices at the ends of the tank are unnecessary, since the riveting of the tank to the underframe at the middle prevents such motion."

That the prior tank cars were not wholly free from objectionable features is sufficiently established, and, while not entirely superseded by the Van Dyke patent, many of them having given excellent service, and, being still in active use, yet they have frequently become prematurely impaired by inertia shocks and stresses developed in trans-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

portation, in spite of the introduction of such substances as oakum or india rubber between the ends of the tanks and the head blocks, to impart elasticity and minimize the dangers of pounding. There was another objectionable feature of the prior tank cars, which the patentee herein designed to overcome, namely, the destructive strains caused by longitudinal expansion of the tank on account of the heated condition of the oil or other liquids, or on account of the steam introduced into the interior for cleaning. To make allowance for such expansion, he rested the ends of the tank on curved plates and passed over them straps or bands, which were anchored to the sills on each side thereof; and to effect the reduction of the strain caused by inertia, and to hold the tank against endwise motion, and from separating from the underframe in a vertical direction, he rigidly riveted the tank to the underframe at the center, and at no other point.

The involved claims read as follows:

"14. A railroad car, composed of an underframe, and a tank secured by rivets at the middle to said underframe, and held at the ends by means which allow the tank to expand longitudinally, substantially as described.

"15. A railroad car, composed of an underframe, and a car body secured by rivets at the middle to said underframe, and held at the ends by means which allow the car body to expand, substantially as described.

"16. A railroad car, composed of an underframe, and a tank secured by rivets at one place to said underframe, and held at other places by means which allow the tank to expand, substantially as described.

"17. The combination of longitudinal sills, plates secured to the said sills at the middle, curved plates or saddles secured to said sills near the ends, a tank riveted at the middle to said first-mentioned plates and resting at the ends on said curved plates or saddles, and straps passing over said tank at the ends and anchored at the ends, substantially as described."

Each claim has four elements: (a) The underframe; (b) the tank; (c) the center anchor; and (d) the straps or end fastenings. Claims 14, 15, and 16 are broad, while claim 17, which includes curved plates or saddles, specifically describes the invention. The defendant denies infringement, avers anticipation, and contends for a narrow construction of the aforesaid claims.

The principal contention is that a proper interpretation of the claims requires the determination that the patentee's evident purpose was to have the center anchor integrally hold the underframe to the tank with such rigidity as to resist strains of all kinds, and, indeed, that his central idea in riveting the plates in the middle was to prevent the tank from sagging or parting from the underframe in a vertical direction, and, if possible, from leaking; that as the defendant's tank is not actually riveted to the underframe, but is capable of being separated therefrom in a vertical direction, the claims should be construed to cover merely the specific construction by which the rigidity of the tank and underframe is secured. But such a narrow construction is not justified by the proofs. The skilled mechanic or draftsman had not at the date of the patent in suit reached perfection in the art of designing car tanks, and there was still room for improvement. Much, of course, had been accomplished to make the transportation of oil or other liquids in tank cars reasonably safe; but, as said, there was a liability to danger from destructive strains and stresses, which it

was important to remove or decrease. Means had been previously devised to minimize such shocks and stresses; but no one before Van Dyke had succeeded in appreciably lessening their harmful effects. The credit accorded to tank cars constructed in accordance with the specification and claims in suit, as evidenced by the appreciation thereof expressed in the proceedings of the Master Car Builders' Association and by their general adoption, is a proper point for consideration in determining patentability.

The defendant relies upon patents granted to Murray & Lamason, Frick, Hughes, Brown, Vanderbilt, and Stucki to invalidate or narrow the claims in suit. The Murray & Lamason patent, granted in 1873, belongs to the type of tank cars using head blocks to protect the ends from blows, as well as straps located close to each end and at other points along the tank. Subsequently other means were adopted for fastening the tank to the underframe, such as dome grapples, or straps fastened to the underframe and extending around the tank to the dome anchorage. Such tank cars, though still in use, are of the class the patentee designed to improve.

The Frick patent, No. 243,881, is asserted by the defendant to positively disclose the patentee's method of riveting the tank to the frame at the center and at no other point to allow for expansion, and shows a loop or strap at one end attached to the sills. It is argued that such structure contains every element of the claims in controversy, and that the specification demonstrates that the patentee merely applied an old method to an analogous subject, without making any change that rises to the dignity of invention; but an examination of the drawings and specification indicates that the boiler of the Frick patent, assuming it to be analogous to a car tank, is not riveted to the underframe at any point, but is connected by a bracket on each side of the boiler. It is impossible to believe that the patent in suit was anticipated by the Frick structure, and to me it only shows that the devising of means allowing for the free expansion of the tanks, which, according to the testimony of the witness Smith, often contain heated oil directly loaded out of the still at a temperature of from 300 to 400 degrees Fahrenheit, was a problem yet to be solved.

The Hughes patent, No. 512,297, describes a car tank attached by rivets to the underframe at four separate points, at two points near the center and at two points near the ends of the tank; but such riveting to the sills near the center does not, in my opinion, correspond to center anchoring. The patent in suit emphasizes that the plates be riveted to the sills at the middle of the tank by separate sets of rivets, and the desideratum of the patentee was to firmly clutch and to rigidly hold the tank to the underframe at the center, and at no other point, to prevent its movement against shocks and strains. There is no such riveting in the Hughes patent as that specified in claims 14 and 15 of the patent in suit. On the contrary, the riveting to the underframe occurs at various places along the underside of the car tank, and not solely in the mid-

dle, to secure a rigid hold at that particular point, nor are the ends of the tank left free to permit expansion, but are instead riveted to the cradles or body bolsters. Such a construction does not correspond to the claims in suit, and therefore the Hughes patent does not anticipate them.

The Brown patent, No. 588,742, describes a tank car having wrought iron ears riveted to the central lower sides of the tank, thus connecting it to the underframe by rivets and plates, so as to prevent it from moving endwise and turning on its axis. The ends are held by diagonal tie rods, which at one end are fastened to a crossbar and at the opposite upper end to the top of the tank by nuts. The object of this method of fastening, together with the use of head blocks and of various straps by which the tank was held to the underframe, was to strengthen and hold firmly in place the upper part of the tank. Clamps are used to engage the "chime of the tank," and it is claimed that if such clamps were omitted the construction would correspond to that of the claims in suit, but that the removal thereof for the purpose of modifying the structure would not involve invention. It is perhaps true that to merely remove the chime clip might not amount to invention, and that the skilled in the art might readily perceive the advantages of its omission; but it is thought unnecessary to consider this question at length, as it is clear that in the Brown patent there is strictly no center anchorage—the principal element of the Van Dyke patent—and that the wrought iron ears at the lower central sides of the tank, to which the underframe in the Brown structure was connected, were incapable of imparting the rigidity of the claims in suit or of permitting the free expansion of the tank.

It is unnecessary to enumerate the other prior structures to which attention was directed at the hearing as none of them, either those using merely head blocks or those using both rods and head blocks, were free from the liability to rupture the ends of the tanks or to leak around the rivets or seams. Corroboration of the testimony of complainant's witnesses Van Dyke and Smith as to the defects encountered in prior tank cars is found in the specifications of several prior patents in evidence and in the proceedings of the Master Car Builders' Association, wherein attention was called to the improved method (center anchorage) of preventing end movements of the tanks, and to the prior unsatisfactory method of fastening tanks between head blocks. By the patentee's method of riveting the plates at the middle, and at no other point, of the tank, which is ordinarily 36 feet long and 72 inches in diameter, and by his adaptation of curved plates upon which the ends of the tank rest, together with his method of anchoring straps at the ends, according to the evidence, a greater power of resistance was secured, and the difficulties from destructive strains and expansion were appreciably diminished.

In opposition to this view the defendant claims that Van Dyke did not progress the art, questions the asserted benefits derived from the improvement, and argues, inter alia, that as the patent

does not show how the end straps could afford free expansion, no such function is performed by them. It is, perhaps, a mooted question whether the tank straps are expanded with the tank; but the expert witness Thomas expressed the opinion that the straps expanded longitudinally and were moved with the tank. Such testimony being undisputed, there is insufficient reason for rejecting it. Defendant also claims that in recent years draft gears have been used to absorb the blows of the larger tank cars, and that by their use center anchors have been largely relieved from strains and shocks, and .while the importance of the patent is, perhaps, somewhat depreciated by such evidence, I am nevertheless of the opinion that credit is due the invention in suit for appreciably reducing the effect of the objectionable strains. Other subjects, relating to bolster rivet troubles, expansion tests, etc., were argued at the bar to negative the novelty of the patent, and, while the testimony relating thereto has been considered, I am disinclined to modify the views herein expressed as to the character of the patent, its achievement, or the scope of the claims.

My conclusion that Van Dyke was the first to devise successful means for riveting the tank to the underframe at the center and to afford means for free longitudinal expansion, removing or reducing the effect of strains and stresses, makes it reasonable to suppose that the claims in suit are entitled to a construction broad enough to include a tank car which appropriates the invention, notwithstanding that such structure by the use of additional features may also perform another function. A reasonable construction of the claims will not permit restricting them merely to a tank body or plates riveted permanently to the underframe.

[1] The defendant's car body in shape is practically the same as complainant's, and the underframe has sills extending the length of the car, to which the tank is rigidly secured in the center on the under side thereof by rivets. On either side of the middle between the walls of the sills there is a recess or pocket, and the tank on its under side has riveted thereto a hollow casing of boxlike appearance, which is inserted into and closely fits the recess or pocket in the underframe. Concededly such construction is the center anchor, and concededly its principal function, as in complainant's structure, is to clutch and firmly hold the tank to the underframe, to assist in preventing longitudinal movement. It is true that defendant's car tank may be lifted from the underframe for the purpose of repairing, and in this respect may have an advantage over complainant's structure; but such change or alteration of the parts does not deprive the patentee of his right to have h⁘ invention protected. It is a fundamental rule that, to constitute infringement, it is unnecessary to use the entire device, and that, if parts thereof are used in substantially the same way and in a similar contrivance, it is infringement. Foss v. Herbert, 2 Fish. Pat. Cas. 31, Fed. Cas. No. 4,957.

[2] The defendant has appropriated Van Dyke's method of center anchoring by riveting the casing to the shell, using according

to the exhibit model about 50 rivets, which perform the identical function of the plates riveted to the shell with the 58 rivets of the exhibit model of the Van Dyke patent in suit. True, the defendant has riveted the casing to the sills in a different way than has complainant; but such differences are negligible, in view of the fact that the same result is achieved. The defendant also uses straps around the car tank, one at each end, and two other straps at points along the tank body, to assist in holding it rigidly to the underframe. The tank body is not riveted at the ends to the underframe, but simply rests on wooden strips placed on curved sills riveted to the underframe, while the straps are anchored on each side thereof. The result of such adaptation is not only to cause the tank and underframe to support each other to prevent endwise motion, as in complainant's patent, but by omitting to rivet or fasten the tank at the ends to the underframe in connection with the adaptation of straps, defendant's tank car, as heretofore pointed out, is allowed free longitudinal expansion, and thus attains the precise result described in the claims in controversy. That in the Brown patent the straps at the ends are fastened to the underframe has not been overlooked, but neither in the Brown structure nor in any structures of the prior art are the ends of the tank free from riveting to the underframe or from some other method of direct attachment thereto.

My conclusion is that claims 14, 15, 16, and 17 are valid and infringed by the defendant. A decree may be entered as demanded in the bill, with costs.